

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

March 16, 2020

**BY ECF**

Honorable Katherine Polk Failla
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007

   Re: *United States v. Kawain Nelson, a/k/a "Kobe," a/k/a "Kobi," a/k/a "Slope,"*
      18 Cr. 454 (KPF)

Dear Judge Failla:

  The Government submits this letter in advance of the sentencing of Kawain Nelson (the "defendant"), and in response to the defendant's sentencing submission, dated March 9, 2020 ("Def.'s Mem."). As explained below, the Government respectfully submits that a sentence within the range of 87 to 108 months' imprisonment, as called for by the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), should be imposed in this case.

**I. Offense Conduct**

  Since at least in or about 2007, the defendant supplied grams of crack cocaine, and quantities of heroin, to dealers in the West Farms section of the Bronx, New York, including in and around the Lambert Houses development. *See* United States Probation Office's Presentence Investigation Report ("PSR") ¶ 10. This included supplying co-defendants James Crooms, a/k/a "Butter," and Anthony Corley, a/k/a "Tone," both of whom in turn supplied street-level dealers, as well as made their own sales directly to customers. *Id.* ¶¶ 10, 13. On intercepted phone calls in 2018, the defendant and Crooms discussed the defendant's supply of more than twenty grams of crack, which the defendant believed had been more than thirty grams. *Id.* ¶ 10 (Nelson: "[I]t was supposed to be thirty." Crooms: "That shit is nowhere near thirty, bro!" Nelson: "What is it!" Crooms: "22.50, bro."). Other intercepted calls confirmed that the defendant supplied grams to Croom and Corley on a regular basis in late-2017 and early-2018. *Id.* While engaging in this narcotics conspiracy, the defendant also possessed firearms, including in or around 2018, when he transferred a .380-caliber pistol to co-defendant Albert Collins, a/k/a "A," which Collins kept for his protection while dealing crack at and around the Lambert Houses. *Id.* ¶ 11

**II. The Defendant's Plea and Applicable Guidelines Range**

  Pursuant to an agreement with the Government, the defendant pled guilty on October 4, 2019, to one count of conspiring to distribute 28 grams and more of crack cocaine, in violation of

Title 21, United States Code, Sections 846 and 841(b)(1)(B).  PSR ¶ 4.  In the plea agreement, the parties stipulated that this offense carries a mandatory minimum sentence of five years' imprisonment and that the advisory Guidelines range was 87 to 108 months' imprisonment, based on an offense level of 29 and a Criminal History Category of I.  *Id.* ¶ 5.  Probation agrees with this calculation.  *Id.* ¶¶ 49-67, 107.

### III.    Discussion

#### A.  Applicable Law

Although *United States v. Booker*, 543 U.S. 220, 264 (2005), held that the Guidelines are no longer mandatory, it also held that district courts must "consult" the Guidelines and "take them into account" when sentencing.  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After performing that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," (2) the four legitimate purposes of sentencing, as set forth below, (3) "the kinds of sentences available," (4) the Guidelines range itself, (5) any relevant policy statement by the Sentencing Commission, (6) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," and (7) "the need to provide restitution to any victims."  18 U.S.C. § 3553(a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)  to afford adequate deterrence to criminal conduct;
> (C)  to protect the public from further crimes of the defendant; and
> (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

#### B.  Analysis

The Government respectfully submits that a sentence in the range of 87 to 108 months' imprisonment is appropriate in light of all of the sentencing factors set forth above, and would be sufficient but not greater than necessary to accomplish the goals of sentencing in this case.

Case 1:18-cr-00454-KPF   Document 194   Filed 03/16/20   Page 3 of 6

March 16, 2020
Page 3

*First*, the nature and circumstances of the offense weigh heavily in favor of such a sentence. For years, the defendant consistently sold poison (both crack cocaine and heroin) to other people—including lower-level suppliers and street-level dealers—knowing that those drugs would ultimately be ingested by addicts in the community. The aggregate weight of drugs that the defendant supplied, sold, and conspired to distribute is extremely significant. The defense submission admits that the defendant was involved in drug dealing over an extended period of years and that "[h]e had certain connections for obtaining drugs" that allowed him to serve as a supplier to lower-level suppliers and dealers. *See* Def.'s Mem. at 3-4. Indeed, the parties agree that the defendant's role in this conspiracy is "defined by the fact that he had access to gram quantities of crack cocaine," which he supplied to other people, including (but not limited to) co-defendants Crooms and Corley. *Id.* at 5. The defendant's culpability is obviously quite different from the street-level sellers, who hustled dime bags to customers.

In addition, as the Court is well aware, the drug trade throughout this city causes immeasurable harm to addicts, their families, and average citizens who are victimized by the crimes that users commit in order to continue feeding their habits. While the defense submission only passingly acknowledges that the defendant's conduct contributed to "fouling our communities," *see* Def.'s Mem. at 6, his own biographical narrative four pages earlier tells the real story. Drug dealers and suppliers, like the defendant, were responsible for feeding his mother's addiction. Rather than learn from his own experience as a fifteen-year-old boy—rather than decide that he would never inflict that harm on others—the defendant went into the same business, without regard for the countless children who would find their mothers strung-out on the defendant's product. The defendant cannot have it both ways, honestly describing the devastation of drug addiction when offering his own mitigating life circumstances, then brushing it aside when describing the effects of his own criminal conduct. If anyone should know the seriousness of the nature and circumstances of his offense, it is the defendant.

It is also undeniable that certain communities in the Bronx are especially hard hit by secondary effects of drug activity; and in recent years, the Lambert Houses and greater Tremont neighborhood have seen countless murders, non-fatal shootings, stabbings, robberies, assaults, and other acts of violence, all stemming from battles over drug territory and other drug-related conflicts. The defendant's continuous participation in that market contributed in material ways to the environment where violent actors could thrive, prosper, and inflict even greater harms on the rest of the population.[1]

*Second*, the defendant's history and characteristics weigh in favor of a sentence within the Guidelines range. Between March 2005 and his arrest in this case, the defendant was

---

[1] Contrary to the defense's baseless attack on the very premise of this prosecution, the Government at no time attempted to "cajole[] or pressure[]" the defendant to do anything. *Contra* Def.'s Mem. at 3. Indeed, the undersigned has no recollection of even discussing cooperation with defense counsel, except perhaps to mention that the Government would be willing to meeting with the defendant, if he were interested. Arresting officers did not conduct a post-arrest interview of the defendant to attempt to ascertain whether he might have useful information. At no time did any prosecutor or agent even request an opportunity to communicate with the defendant about his options for resolving the case, for example, in a reverse-proffer

March 16, 2020
Page 4

arrested 26 times—seven times for possession or sale of a controlled substance (2007, 2008, twice in 2009, 2011, 2015, 2016); three times for possession or sale of marijuana (2005, 2008, 2010); two times for armed robbery (2010, 2013); and once for criminal possession of a loaded firearm (2012). *See* PSR ¶ 12. These arrests resulted in four convictions—three for criminal possession of a controlled substance (2009, 2011, 2016), and one for disorderly conduct (2008). *Id.* ¶¶ 62-65.

The last conviction and sentence—and the defendant's conduct since—are especially noteworthy for several reasons. After being arrested following a crack sale to an undercover officer in August 2016, the defendant was allowed to plead guilty to Criminal *Possession* of a Controlled Substance, a Class A misdemeanor, *see* N.Y. Penal Law § 220.03; and on November 15, 2016, he was sentenced to a conditional discharge. *Id.* ¶ 65. This was a lenient plea offer in place of the factually and legally applicable Criminal Sale felony offense under New York Penal Law § 220.31. While under the state court's supervision (in the form of the conditional discharge), the defendant continued to engage in the offense conduct at issue in this case, captured over wiretaps and surveillance in 2017 and early-2018. Indeed, his supplying crack and heroin throughout the Lambert Houses continued unabated. The defendant's conduct thus demonstrates a total disregard for the law and for courts that try to uphold the law through punishments tempered by leniency. Moreover, were it not for this federal case, the defendant would almost certainly have completed the term of his conditional discharge (which is often two years), and he would have been permitted to re-plead, likely to a disorderly conduct violation under New York Penal Law § 240.20. Under New York Criminal Procedure Law § 160.55(1), a disorderly conduct adjudication is automatically sealed after two years.

When addressing the defendant's criminal history, he again presents the Court with irreconcilable narratives. He maintains that his 26 arrests reflect nothing more than over-policing of young black men. *See* Def.'s Mem. at 4 n.3. Yet, one page earlier, he more accurately describes what happens in the state's criminal courts: defendants like this one are repeatedly given opportunities to avoid serious felony convictions or jail, as they "receive sentences of time served, or enter programs, or participate in the boroughs' drug courts." *Id.* at 3. There is no way for the Government to know how many of the defendant's 22 arrests with no reported conviction ended in a conditional discharge, a drug program, a re-plea to disorderly conduct, and a sealed record. Or how many times the defendant claimed to need a drug treatment program and exploited the state system's willingness to give drug offenders chance after chance to stop. It is also frankly confounding that the defendant admits to selling drugs since in or about 2007, yet claims that almost two dozen arrests were the result of over-policing. The Government submits that, given his admitted conduct, the policing was quite warranted, though unfortunately insufficient to stop the defendant from reoffending again.

---

session. The defendant was never someone targeted to "flip" on any other targets or crimes. In short, any "pressure" the defendant felt to cooperate was self-imposed, as he likely balanced his stated interest in returning to his family as soon as possible against his unspoken interest in remaining faithful to a street code of not "snitching" (of which he obviously chose the latter). This prosecution, meanwhile, appropriately addressed the defendant's years of significant drug trafficking, for which he has never received a sufficient or effective punishment.

March 16, 2020
Page 5

     The defendant trafficked drugs for more than a decade, despite seeing firsthand the devastating effects of drug addiction, and despite having ample opportunity to do something else with his life.  Regarding his history witnessing addiction, the defendant represented to Probation that he was raised in kinship foster care because both of his parents used drugs.  *See* PSR ¶ 74.  Despite this background, the defendant profited by thrusting the same fate onto countless other children as he fed their parents' addictions.  He did so despite being a physically and mentally fit man, *see id.* ¶¶ 84-87, with a GED since 2005, *see id.* ¶ 93, and an OSHA certificate, *see id.* ¶ 96.  Clearly, at several points throughout his life, the education or justice system facilitated the defendant's obtaining a degree and employable skills.  He claims to have held jobs throughout his life, all of which are unverified by Probation, *see id.* ¶¶ 97-101, and even so, he continued to traffic crack cocaine and heroin.  The defendant's sentence must reflect the duration and extent of his criminal history, as well as the fact that he opted to commit these crimes despite having the ability to live a law-abiding life.

     *Finally*, a sentence within the Guidelines range is needed to adequately punish the defendant and to demonstrate the seriousness of his conduct, including more than a decade of criminal activity, which has harmed the citizens of the Lambert Houses and broader Tremont community.  Such a sentence would also promote respect for the law and serve to deter the defendant from future crimes—a goal that was not accomplished by any of his prior drug arrests and convictions, including his 2016 sentence to a conditional discharge, during which the defendant continued to traffic crack cocaine.  Looking beyond the defendant himself, in a case like this, where the defendant was known to be a supplier to many members of a large drug conspiracy that was charged federally, there is a significant need for general deterrence—*i.e.*, for others who aspire to profit from the drug trade to learn that such activity will result in a lengthy sentence if prosecuted in federal court.  In addition, a Guidelines sentence in this case will help protect the public from the defendant, his co-conspirators, and anyone else deterred by the incarceration of defendants in this case.  And a Guidelines sentence here will avoid unwarranted sentencing disparities between the defendant and those whom he supplied drug product.[2]

---

[2] At the conclusion of his submission, the defendant claims that "New York City, [and] New York State, the entities primarily responsible for protecting the interests of their communities, have determined that it does not serve anyone's interest, including society's more generally, to incarcerate low level drug dealers for years on end."  Def.'s Mem. at 6.  In response, the Government notes, <u>first</u>, that federal law enforcement is also responsible for protecting the interests of the community and any suggestion otherwise is misguided.  <u>Second</u>, the defendant, by his own admission, was not a "low level drug dealer"; rather, he "had access to" and indeed trafficked, "gram quantities of crack cocaine."  *Id.* at 5.  He did not stand on the street corner pitching to users or make sales to feed his own addiction.  Nor is the defendant the classic "first-time offender" whose case stems from his first few youthful indiscretions.  As argued above, the defendant is far more culpable than that and far beyond the point where leniency is warranted on this basis.  <u>Finally</u>, the Bronx's and the state's approach to crime should be given little weight, given that the defendant was subject only to state arrests and prosecutions for the last fifteen years, and none of his trips through the cycle of "time-served" sentences, "programs," and "drug courts," *see id.* at 3, ever stopped him from engaging in the same criminal conduct, over and over.  Nor did the state's approach protect the defendant's family from the dealers who plagued his mother.  Nor have the state's recently adopted approaches to crime worked particularly well

March 16, 2020
Page 6

**IV.     Conclusion**

For the foregoing reasons, the Government respectfully requests that the Court impose a sentence within the Guidelines range of 87 to 108 months' imprisonment.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By: _____
Frank J. Balsamello / Sarah Krissoff
Assistant United States Attorneys
(212) 637-2325 / -2232

cc:     Florian Miedel, Esq., *counsel for defendant Kawain Nelson* (by ECF)

---

to ensure the safety of the community in the first months of this year. *See, e.g.*, *New York City sees surge in major crime*, Mar. 5, 2020, https://www.fox5ny.com/news/new-york-city-sees-surge-in-major-crime; *Overall Crime Up 16.9 Percent in New York City in January, NYPD Says*, Feb. 4, 2020, https://www.ny1.com/nyc/all-boroughs/public-safety/2020/02/04/overall-crime-up-16-9-percent-in-nyc-in-january--nypd-says. Simply put, the Court should take no guidance from what the state does. Lastly, the defense opines that "the federal system perhaps pursues other interests" than the city or state, *id.* at 6, but the Government submits that just one overriding interest—protecting the public—warrants a Guidelines sentence for this defendant in this case.