K4L9WALC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          18 CR 454 (KPF)
                                   Remote Telephone Conference
5
    ALLEN WALKER,
6
                   Defendant.
7
    ------------------------------x
8
                                   New York, N.Y.
9                                  April 21, 2020
                                   11:14 a.m.
10
    Before:
11
                   HON. KATHERINE POLK FAILLA,
12
                                   District Judge
13

14                      APPEARANCES

15  GEOFFREY S. BERMAN,
         United States Attorney for the
16       Southern District of New York
    FRANK J. BALSAMELLO
17       Assistant United States Attorney

18  MAHER & PITTELL
         Attorney for Defendant
19  BY:  JEFFREY G. PITTELL

20  ALSO PRESENT:  KEYANA POMPEY, Pretrial Services

21

22

23

24

25

K4L9WALC

1          (The Court and all parties appearing telephonically)

2          (Case called)

3          MR. BALSAMELLO:  Good morning, your Honor.  Frank

4     Balsamello for the United States.

5          THE COURT:  Good morning, sir.

6          MR. PITTELL:  Good morning, your Honor.  It's Jeffrey

7     Pittell appearing for Mr. Walker.

8          THE COURT:  Good morning to you as well.  Is there

9     someone on the line representing the pretrial services office?

10          MS. POMPEY:  Good morning, your Honor.  Keyana Pompey

11     appearing for pretrial services.

12          THE COURT:  Thank you very much.

13          And I believe, as well, we have a court reporter on

14     the line.

15          Because of that, I would ask the parties to please be

16     careful when they're speaking not to speak over someone else

17     and if you are -- if it's not obvious who you are, for example

18     if you're not responding to a question that I've specifically

19     asked you to answer, could you please announce who you are so

20     that the court reporter is aware.

21          And I would invite the court reporter, who is here

22     with my deepest thanks, to let us know if there are any

23     problems hearing what's going on.

24          Mr. Pittell, this is a conference that I convened in

25     response to an emergency bail application on behalf of your

K4L9WALC

1   client, Allen Walker.  Arguably, it is a legal conference under

2   Federal Rule of Criminal Procedure 43 but arguably, as well, it

3   could be perceived as a detention hearing that under the CARES

4   Act I am able to conduct telephonically if the client,

5   Mr. Walker in this case, is aware of and consents to not

6   appearing on the call.

7           Could you please let me know, could you please place

8   on the record the communications that you've had with

9   Mr. Walker regarding the rights that he has and his ability to

10  waive those rights.

11          MR. PITTELL:  This is Jeffrey Pittell.  Sure.

12          I spoke with Mr. Walker yesterday, explained the

13  rights that you just mentioned to him, and he told me that he

14  will consent to my waiving his appearance on this phonecall.

15          THE COURT:  All right.  Thank you.

16          And prior to the call yesterday have you had other

17  discussions with him -- I don't want to know the privileged

18  communication, sir -- but other discussions where you've

19  suggested to him that he may need to waive his presence or may

20  be given the opportunity to waive his presence in order to have

21  a call take place more quickly?

22          MR. PITTELL:  I have not had any direct discussions

23  with him on that but as I alluded to in some of my

24  correspondence, I've spoken with family members who were able

25  to speak with him and I asked them to tell him to call me and

K4L9WALC

1    to explain to him that I had this bail hearing pending and that

2    I need to speak with him in order to waive his appearance.

3         THE COURT:  OK.  Fair enough.  And I should have begun

4    the conference --

5         MR. PITTELL:  I'm sorry.

6         THE COURT:  Go ahead, please.

7         MR. PITTELL:  And so I should also just add that in

8    general the response of the family was that he wanted to go

9    forward with the bail hearing and then to be released on bail.

10   So I can infer that he would have been willing to -- for me to

11   waive his appearance had I not been able to speak with him

12   yesterday.

13        THE COURT:  OK.  But then you were able to speak with

14   him so we have something more direct.  Thank you.

15        What I had meant to begin by saying was I do hope that

16   everyone participating in this call is well and that the same

17   can be said for your families and loved ones and clients.

18        Mr. Pittell, what I understand is that there was some

19   discussion with the government about reaching agreement as to a

20   set of conditions on which Mr. Walker could be released but

21   those discussions have broken down.

22        Is that fair to say, sir?

23        MR. PITTELL:  I don't -- this is Jeff Pittell again

24   speaking.  I don't know if I want to call it broken down.  I

25   think there is just maybe one general condition regarding the

K4L9WALC

1    third party custodian and the no-visitor requirement in the

2    government's proposed order that I'm having difficulty finding

3    a suretor that will comply with that, and that's -- so to the

4    extent there's a breakdown, I think it's just my inability to

5    specifically meet the condition as worded in the government's

6    proposed order.

7         THE COURT:  And I want to be clear.  You and the

8    government can have the agreements that you have.  That doesn't

9    necessarily mean that I would accept it.

10        I've been reviewing the presentence investigation

11   report which I had because this case was so close to

12   sentencing.  There are names that have been proposed to me in

13   your correspondence as potential suretors or cosigners, either

14   folks with moral suasion or folks who are financially

15   responsible parties.  But there are some folks whose names I

16   haven't heard and I wanted to know if they had a position.

17        Mr. Pittell, there is a woman named Darlene White whom

18   Mr. Walker refers to as his best friend.  She is employed as a

19   nurse.  Is she unable or able to sign a bond on his behalf?

20        MR. PITTELL:  I spoke with her.  The problem was that

21   she is unable to have him in her residence.  There's just too

22   many people there.  If you give me a moment I can just review

23   my notes regarding her.  Because I spoke with her and -- she's

24   not a possibility that's why I'm -- (pause) I spoke with her

25   and in searching for a place for him to live and that just

K4L9WALC

1   wasn't a possibility.

2          THE COURT:  Even if for any number of reasons

3   Ms. White was unable to have Mr. Walker live with her, is she

4   willing to sign a bond as a financially responsible person?

5          MR. PITTELL:  That I don't know.

6          THE COURT:  OK.  There is also another, mother of his

7   child, Shantin, and I should really spell that correctly,

8   excuse me.  It is S-H-A-N-T-I-N Pineago, best guess on how to

9   pronounce it, P-I-N-E-A-G-O who is a security guard.

10         Is Ms. Pineago available either as a potential

11  provider of residence or as a potential cosigner on the bond?

12         MR. PITTELL:  I haven't spoken with her throughout the

13  pendency of this case.  I've had contact with all the people

14  who I have referenced in the letters as well as Ms. White and

15  I've never spoken with her and Mr. Walker -- in fact, I think

16  the first I heard of her was during the presentence interview.

17  So I have not reached out to her.

18         THE COURT:  OK.  And then there's a reference to -- I

19  believe this is Mr. Walker's cousin, Joelle Dixon, who is one

20  of the residents, I think, in his aunt's apartment here in the

21  New York area.  Mr. Dixon is listed -- I believe he's a

22  Mr. Dixon.  He's 20 years old.  Does he work outside the home?

23         MR. PITTELL:  Yes.  I believe that's one of

24  Ms. Doxen's sons and I inquired about having both of them sign.

25  Neither of them are willing to sign.

K4L9WALC

1          THE COURT:  I'm sorry.  He's not willing to sign.  OK.

2          MR. PITTELL:  No.

3          THE COURT:  So then let me -- that actually leads

4   right into the concern that I have.  We have a couple of

5   different issues here and one is, of course, finding a

6   residence that would be safer than the situation that

7   Mr. Walker currently has and a second concern that I have is

8   finding folks who are known to Mr. Walker and trust him enough

9   that they're willing to sign a bond for his release.

10          It is of concern to me that Ms. Doxen, excuse me that

11   I said her name incorrectly, Donna Doxen, who is the maternal

12   aunt, and her son are unwilling to sign because right now the

13   folks who are, are Ms. Francine Doxen, Mr. Walker's mother, who

14   would only be available for moral suasion, and Ms. Williams,

15   the one financially responsible person.  And it is also of

16   concern to me that the mother of two of Mr. Walker's children,

17   that is Ms. Stephanie Twilley T-W-I-L-L-E-Y is willing to let

18   him live in her home but unwilling to let him sign a bond.

19          I guess what I'm saying, Mr. Pittell, in a bit of a

20   circuitous manner, is I don't feel that there are enough folks

21   who are willing to be cosigners to give me comfort that

22   Mr. Walker will remain in place and not commit any crimes and

23   not flee in advance of sentencing.  So what can be done to give

24   me the confidence that I need?

25          MR. PITTELL:  Well, I could go back and speak with

K4L9WALC

1    Ms. White.  I could go back and speak with people who I have

2    not spoken with.  I could speak with his mother and tell her

3    that we need more people.  I could do the same with

4    Ms. Williams.  And that's really it.

5            I mean I understand why Ms. Twilley is unwilling to

6    sign the bond.  Her unwillingness to sign the bond is not

7    because she thinks he's going to flee.  It's just from her

8    perspective is their relationship ended a long time ago.  He

9    is, though, the father of their children.  She does not want to

10   see harm come to him.  She's willing to take him into her

11   apartment, which is an imposition on her current state of life

12   because it's a one-bedroom apartment in the Bronx and it is

13   shared by three people and so now there would be a fourth

14   person in there, and he owes her child support and there's a

15   judgment and she just doesn't want to do anything that could

16   potentially put her in a dire financial circumstance.  I can

17   understand that.  So I don't think it's her reason not to flee.

18           As far as the two sons of Ms. Doxen, who are both

19   actually working for delivery services so they're actually both

20   very busy.  They both don't have a -- much of a rapport with

21   Mr. Walker.  I think one is ten years younger and I think

22   another may even be twenty years younger.  So even though

23   they're first cousins, I don't think they had much interaction

24   growing up with each other so I don't know how close they are

25   in terms of a relationship.  So that is the reason why I was

K4L9WALC

```
 1    told that they were unwilling to sign the bond.  I can keep

 2    looking.

 3              In terms of the residence, I can at least update from

 4    my correspondence is both his mother and Ms. Williams are

 5    willing to take him into their houses in Georgia which, while

 6    I'm a little concerned about the distance, but putting that

 7    aside for the moment, I think from a safety perspective that's

 8    the best situation because they are houses as opposed to

 9    relatively small size New York City apartments so he can be

10    quarantined when he gets there and he's not going to be on top

11    of the other people that are living there.

12              I can arrange to have -- Ms. Doxen told me that her

13    son will drive there, drive to New York, and wait for

14    Mr. Walker at MCC.

15              THE COURT:  One moment, please, sir.  The Ms. Doxen of

16    whom you are now speaking, is that Mr. Walker's mother or his

17    aunt?

18              MR. PITTELL:  His mother, Ms. Doxen.

19              THE COURT:  Thank you.

20              MR. PITTELL:  Look, I realize you have not granted

21    bond yet.

22              THE COURT:  On this record I'm not going to so I just

23    want to be clear about that.  But go on.  Keep going.

24              MR. PITTELL:  At least in terms -- I just wanted to

25    inform you of the logistics of how I could get him to Georgia
```

K4L9WALC

1    would be to have somebody waiting for him at MCC with a car and

2    drive him right to Georgia.  I think it's preferable doing it

3    that way as opposed to trying to figure out how to get him to

4    the Port Authority and him going on a bus or somehow getting to

5    an airport and taking a flight.  I don't know if there's trains

6    to where they are in Georgia but, if there was, getting to Penn

7    Station and taking a train.  So that's what I would do as far

8    as that.

9          I understand your concerns about sureties and I will

10    continue to look and what I'll do is once I have more concrete

11    information, file a letter to the Court or request a subsequent

12    conference, whatever is more preferable.

13          THE COURT:  OK.  Let me please speak with the pretrial

14    services officer.  Ms. Pompey, you remain on the line?

15          MS. POMPEY:  Your Honor, I'm here.

16          THE COURT:  Thank you very much.

17          Ms. Pompey, I'm going to wait and see what Mr. Pittell

18    is able to find out about additional suretors.  But in terms of

19    the logistics, you've just heard discussion about how a member

20    of the family might meet him -- him being Mr. Walker -- at the

21    MCC and drive him down to Georgia.

22          How, if at all, would the pretrial services office be

23    able to monitor Mr. Walker while he was in transit and once he

24    arrived at -- in Georgia?

25          MS. POMPEY:  Yes, your Honor.  We would place location

K4L9WALC

| | |
|---|---|
| 1 | monitoring device on Mr. Walker, which preferably will be a GPS |
| 2 | unit considering the travel circumstance, at least until he |
| 3 | arrived to Georgia and have the office there decide whether |
| 4 | that GPS unit should remain on him or be switched out, |
| 5 | considering he will be on home incarceration.  So with no |
| 6 | movement, there would probably be no reason for a GPS.  But we |
| 7 | are able to connect a device for transit. |
| 8 | THE COURT:  In this pandemic era, will you have the |
| 9 | ability to obtain a courtesy supervision from pretrial services |
| 10 | offices in Georgia near the residence? |
| 11 | MS. POMPEY:  We would absolutely make a courtesy |
| 12 | request.  I have not had the opportunity to see how that |
| 13 | district is going about a courtesy request or location |
| 14 | monitoring cases but we would make a request if your Honor |
| 15 | decided to release the defendant. |
| 16 | THE COURT:  OK.  From the perspective of pretrial |
| 17 | services, is it preferable to have Mr. Walker in the New York |
| 18 | area or in the Georgia area? |
| 19 | I think you've heard from Mr. Pittell the pros and |
| 20 | cons of each that New York is obviously closer than Georgia but |
| 21 | Georgia provides a separate bedroom rather than a shared |
| 22 | apartment. |
| 23 | MS. POMPEY:  Yes.  Pretrial would prefer for the |
| 24 | defendant to stay in the New York area, especially considering |
| 25 | his history, it is not an ideal situation to send him to |

K4L9WALC

1      Georgia, but -- we leave it up to the Court.

2              THE COURT:  I didn't want to cut you off.  Excuse me.

3              Mr. Balsamello, I appreciate your patience on this

4      call.  I think you're understanding from the questions that I'm

5      asking that I'm not satisfied with the current surety packages

6      that have actually been proposed by either side.

7              I don't know that I know your office's position on the

8      possibility of Mr. Walker residing in Georgia.  I do think I

9      understood that you were opposed to his residing with his aunt

10     because of the two sons who were not in a position, it would

11     seem, to social distance and to not bring friends to the house.

12     And I believe, as well, that you were concerned about

13     Ms. Twilley as a potential place of residence because of her

14     unwillingness to sign the bond.

15             What is the government's view about the possibility of

16     Mr. Walker residing in Georgia?

17             MR. BALSAMELLO:  Your Honor, I think that if pretrial

18     services is comfortable with the degree of monitoring that can

19     be done down there and that the conditions can otherwise be met

20     and that his mother can assure a quarantined home and check-ins

21     as pretrial requires, as the Court directs and all of the other

22     things that would give everyone comfort that he was in that

23     specific location such that when this ends we know where he is

24     and will be sure that he returns.  I think it is far from ideal

25     but if the monitoring, the electronic monitoring is in place,

K4L9WALC

1    the check-ins are in place, I think it could be satisfactory.

2            Obviously, this all comes against the backdrop of

3    someone with his criminal history who was a fugitive in this

4    case for ten months.  As your Honor saw, the concern about

5    Ms. Twilley not signing the bond, she then would really have no

6    obligation to make sure he didn't leave that apartment or do

7    something else from that apartment.  And his aunt's apartment

8    is seemingly to be less safe or no safer than quarantining at

9    the MCC.  So among all these options, if monitoring can be done

10   appropriately from Atlanta, that seems like the best that's on

11   the table here.

12           THE COURT:  All right.  Let me then be clear to the

13   parties.  Looking at the PSR, looking at Mr. Walker's history,

14   his criminal history, looking at the fact that he was on the

15   run for ten months in this case, the packages that the parties

16   have suggested to me are, in my estimation, insufficient to

17   give me comfort.  And so I believe, I think that Mr. Walker

18   should be providing at least three financially responsible

19   parties and he can have all the moral suasion that he wants.

20   That's fine too.  But I would want three financially

21   responsible parties and much more comfort and understanding

22   about the residence in Georgia before I would let him go there.

23   Certainly if Ms. Twilley was willing to let him be in her home

24   and was willing to sign the bond she could be moral suasion

25   but, again, if the route the people are thinking about is

K4L9WALC

 1   residing with his mother in Georgia, there should be three

 2   financially responsible persons in addition to the moral

 3   suasion of Ms. Francine Doxen.

 4          So with that, I'll let the parties go and tell me

 5   whatever -- go out and find whatever they want to find and come

 6   back to me.  I'm obviously -- look, I'm in chambers a couple

 7   days a week.  I'm there today.  I'll look at whatever you send

 8   my way.  But I don't have the confidence that I need for a

 9   gentleman who is steps away from being sentenced and has a

10   sense of what the sentences are for the other defendants, I

11   don't have the comfort that I need.

12          With that, Mr. Balsamello, is there anything that you

13   want to bring to my attention in this conference that you have

14   not been able to do?

15          MR. BALSAMELLO:  No, your Honor.  Thank you.

16          THE COURT:  Thank you.

17          Mr. Balsamello, I'm going to impose upon you to obtain

18   a transcript of this conference.  Please give it to Mr. Pittell

19   when you receive it so that he may gave it to Mr. Walker

20   because of Mr. Walker's inability to attend.

21          MR. BALSAMELLO:  I'll do that.

22          THE COURT:  Thank you.

23          Mr. Pittell, is there anything else you'd like me to

24   know in this conference?

25          MR. PITTELL:  No.  Thank you.

K4L9WALC

1            THE COURT:  All right.  I thank you very much and I'll

2    hear from the parties when it is appropriate to do so.  For now

3    I'll ask those of you who are not my deputy or my law clerk to

4    disengage from the call with my thanks.  Thank you.

5            (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25